MONROE, J.
On a former occasion, defendants herein brought suit against plaintiff for the recovery of a balance of $3,033.33, .alleged to be due under an executed contract for the erection of a kiln (with certain appurtenances) for the drying of lumber, and plaintiff set up that defendants had violated their contract, with the result that it, plaintiff, had sustained damage to the amount of ■$7,625.47, for which it prayed judgment in ■reconvention. In deciding the case on appeal, this court, among other things, said:
“Then, taking the position of plaintiffs in re-•convention, defendants ask compensation for, first, destruction [deterioration] in value of -2,141,156 feet of lumber, piled in its yards unavoidably in an unseasoned condition, by reason of the breach of contract, $6,123.47; second, by reason of stoppage caused by the failure of the carriers to operate as they should have done, .resulting in stopping the sawmill, for adapting radiators and for rearranging channels and ■remedying defects in stacks, $500 are claimed; third, loss of orders in defendants’ business •caused by delay in delivering the kiln and the impossibility of drying the lumber to fill the -orders, for which the amount of $1,000 is claimed.”
The general facts of the case, as also the -particular facts upon which the claim for ■ damages was predicated, were then considered, and the conclusions were reached that plaintiffs (defendants herein) had been guilty ■ of an active violation of their contract, and were liable for the damages alleged, and proved that the proof entitled defendant ■ (plaintiff herein) to recover the amounts of ■the “second” and “third” items, as above set ..forth, but that the evidence adduced in support of the “first” item was insufficient to authorize a judgment therefor, and judgment was accordingly rendered on the reconventional demand, for $1,500, being the amount claimed as the second and third items of that demand, the claim for damages “for deterioration of the lumber, viz., * * * No. 1 of the account,” being dismissed, as in case of nonsuit.
Thereafter the defendant (in the suit referred to) instituted the present suit, upon the item with respect to which it was non-suited, and it now alleges that:
“Your petitioner, in compliance with the requirements of said decision of the Supreme Court, holding that the quality of lumber of the different grades, as well as the quantities, thereof, should be, with more directness, set out, avers that during the time when said defendant was in default by reason of the violation of the aforesaid contract, as set out in said proceedings, to wit, from November 21, 1900, to the 20th of February, 1901, it cut and was compelled to stack in its yards, without kiln drying the same, 2,669,509 feet of lumber, the entire output of the said mill; that, in order to minimize the loss which would necessarily result from said lumber not being kiln dried, it sold and shipped green 628,353 feet, leaving in its yard exposed to the air and without being kiln dried 2,041,156 feet of lumber, and your petitioner avers that, by reason of the failure to kiln dry said lumber, it necessarily and unavoidably became blue from exposure to the atmosphere while in a green condition, and deteriorated in value to the extent of $6,735.50, which was the necessary result and consequence of the breach by defendants of the aforesaid contracts.”
It further alleges that of the whole amount of lumber affected 20 per cent, would have graded as First and Second Clear, and was damaged to the extent of $8 per 1,000, amounting to $3,265.84. Twenty-five per cent, was of the quality known as “Star,” or Third Clear, and was damaged to the extent of $5 per 1,000, amounting to $2,551.14. Forty-five per cent, was of the quality known as “No. 1 Common,” and was damaged to the extent of $1 per 1,000, amounting to $918.52, and the remaining 10 per cent, was “No. 2 Common,” and was not appreciably injured. Defendants pleaded the general denial; and, on the trial in the district court their counsel con *919 tended that the question whether they had violated their contract by undue delay in its execution had not been decided in the previous suit, but had been reserved, and hence was still open, from which they argued that, for the purposes of the present suit, plaintiff should have alleged delay, occasioned by the fault of defendants, a putting in mora, by plaintiff, and the damage resulting from such delay: The learned judge a quo was at one time disposed to adopt the view thus suggested, but finally concluded that the judgment in the previous suit determined all other issues, save that as to the fact and amount of the damages there claimed, as the first item, the recovery of which is the object of the present demand, and the admission of evidence was restricted accordingly. His reasons for so ruling are stated in the opinion prepared by him as follows:
“As to the particular damages here claimed, the Supreme Court decreed that plaintiffs’ demand, for want of sufficient proof, should be dismissed, as in case of nonsuit; that is to say, as though there had been no suit. So well was this understood that, when plaintiff sued anew, it changed forum, and, because of defendants’ residence in New Orleans, brought its demand before the civil district court for the parish of Orleans, instead of the district court for the parish of Tangipahoa, as originally. The cause therefore came before this court as a new and independent action, with the burden on plaintiff of proving its demand, independently of any evidence offered in the former action. But, inasmuch as the demand was for damages growing out of the breach of contract adjudged in a prior suit between the same parties, the court ruled that the judgment in said suit was conclusive proof that there was a contract, as set forth in the pleadings therein, that said contract had been violated by Bayne & Joubert, and that, for said violation, Payne & Joubert had made themselves liable in damages to the Amos Kent Lumber & Brick Company. In so ruling, the court was guided by the settled jurisprudence, that matters once determined by a court of competent jurisdiction, if the judgment has become final, can never be called in question by the parties or their privies. This estoppel extends to every material allegation which was at issue in the cause and was therein determined. Heroman et al. v. La. Institute, etc., 34 La. Ann. 805; Sewell v. Scott, 35 La. Ann. 553; Broussard v. Broussard, 43 La. Ann. 921, 9 South. 910; Tutorship of Scarborough Minors, 44 La. Ann. 288, 10 South. 858; McNeely v. Hyde, 46 La. Ann. 1083, 15 South. 167. The court’s ruling, however, went no further. The burden still rested; on plaintiff of proving the identity of the contract in suit with the one which had been primarily determined, and of substantiating every averment of the petition not covered by the judgment aforesaid. It was therefore essential to produce the contract in evidence,” etc.
We are of opinion that the reasons thus assigned afford a conclusive answer to the contention — urged in the district court and insisted on here — that the whole question of defendant’s liability for their breach of contract was left open by the decision heretofore rendered by this court, and that the judge a quo correctly ruled that there was nothing left open by that decision save the question whether, through the breach of contract, there found to have been committed, plaintiff herein sustained the particular loss, which was there found to be insufficiently proved, and which it now again seeks to have made good. It is true that, in the opinion upon which the decision mentioned was predicated, this court, having found that Payne & Joubert had actively violated the contract sued on by supplying defective machinery or appurtenances, and had thereby delayed the Amos Kent Company in the operation of its plant, and having found that the damages claimed, if sustained at all, resulted as the consequences of such active violation, considered it unnecessary to pass on the question of Payne & Joubert’s delay in the execution of said contract as a distinct issue, though it was said;
“But, if there are damages due to mere delay, it appears to us that the repeated demands, both verbal and in writing, made by defendant to plaintiffs, to commence with the work and comply with their contract, was sufficient placing in mora to enable defendant to recover damages on that ground, if there are any damages other than those traced to the cause above mentioned [i. e., the defective execution of the contract in constructing a defective dry kiln and appurtenances forming part of and attached to defendants’ lumber plant].”
Moreover, as has been stated, there was judgment for defendant, on its reconven *921 tional demand, for $1,500, of which $500 was Awarded as damages resulting from “stoppage, caused by the failure of the carriers to ■operate as they should have operated, resulting in stopping the sawmill,” etc., and $1,000 was awarded as damages resulting from “loss ■of orders in defendant’s business, caused by delay in delivering the kiln and the impossibility of drawing the lumber to fill the orders,” from which it is evident that the question of delay was considered, so far as it was necessary to be considered, separately from the active violation of contract which produced it. On .the trial of the case, the following named witnesses were examined ■on behalf of plaintiff, to wit: W. C. Kent, plaintiff’s general manager, in charge of sales ■and familiar with operation of mill (as owned :by plaintiff and its predecessors) since 1887; A. L. Stoessel, receiving clerk and shed foreman for mill in Mississippi, but in 1900-01 plaintiff’s superintendent of mill and yard; Duncan Carter, now and in 1900-01 plaintiff’s ■lumber grader; H. H. Davis now and in 1900-01 plaintiff’s mill foreman; J. H. Miller, now in charge of plaintiff’s yard, dry shed, and planing mill, has had 9 years experience in stacking long leaf yellow pine lumber, has 'been in lumber business for 20 years; P. H. Enochs (expert), manufacturer of long leaf yellow pine lumber since 1883; E. R. Green-law (expert), manufacturer of long leaf yellow pine lumber for 15 years; W. O. Elridge, ■(expert), manufacturer of long leaf yellow pine lumber for 20 years; C. W. Robinson (expert), manufacturer of long leaf yellow ■pine lumber for 9 years, owner of four mills in Alabama and Mississippi; Chas. E. Brack•enridge (expert), manufacturer, long leaf yellow pine lumber, in the business all his life, -and for past 6 or 7 years in personal charge of mill in Livingston parish; W. A. Baber, in■spector for Southern Lumber Manufacturers’ Association, charged with duty of visiting ■different mills and reporting condition of stocks, also with duty of training graders, has been familiar with business for about 17 years; James Ramsay, manufacturer for about 18 months, but for 20 years in the employ of the Pullman Company, during 10 years of which time he bought all of its yellow pine, amounting to 25,000,000 or 30,000,-000 of feet per annum; L. B. Conroy has been actively engaged in lumber business since 1878, in Louisiana, since 1893 has operated large mills and superintended stacking of yellow pine lumber. These witnesses, without exception, testify that it is practically impossible to prevent long leaf yellow pine lumber from bluing when stacked green and in large quantities in the open air, particularly in a warm, moist atmosphere. Kent testifies that at and during the time that the lumber in question was stacked there was a good deal of showery weather, and many warm, moist days. Kent, Stoessel, and Carter testify, as a fact, that the lumber “blued” by reason of the stacking, and was depreciated in value to the extent of $10 per 1,000 on the Clear and Star, 1x8, 1x10, and 1x12, $5 per 1,000 on the Clear and Star strips, and $1 per 1.000 on the No. 1 Common. Davis, McLaughlin, Enochs, Baber, and Conroy, testifying upon the facts stated to them, say that the loss would amount to from $8 to $10 per 1,000 on Clear and Star, 8, 10, and 12 inch stuff; from $4 to $6 per 1,000 on the strips, and $1 per 1.000 on No. 1 Common. Elridge says that the effect of stacking long leaf yellow pine lumber green is that it “blues and suffers deterioration,” which reduces the market price from $3 to $5 per 1,000. Greenlaw (examined as an expert) says:
“In air drying, the clear (A) grade is eliminated entirely; this grade being reduced to Star and No. 1 Common. The amount of loss of 8, 1Ó, or 12 inch boards, sent to yard, for drying, expressed in dollars and cents per 1,000 feet, can he obtained through the aid of the association price list covering the period of the air drying. I have not one of these lists, but, from memory, I should say the difference in market value of 8, 10, and 12 inch, clear finish, and 8, *923 10, and 12 indi ‘No. 1 Common,’ boards, is between $8 and $10 per 1,000 feet. The difference in price of 4 and 6 inch Clear and No. 1 Common is $4 to $6. Air drying No. 1 Common and No. 2 Common does not reduce the value of the lumber from the standpoint of the' association grading rules, but, if a customer can have free choice, he prefers to have the kiln dried.”
Robinson says:
“My experience has been that fully 75 per cent, of sap boards air dried lose one grade in the drying; that is, they deteriorate or take one grade lower than they would have graded green from the 'saw.”
And he further testifies that while theoretically it may be possible to prevent the bluing of yellow pine lumber when stacked green in the open air practically it is impossible; “that is to say, if a piece of lumber was grabbed from the saw and carried by a man, so that it didn’t lie on the mill raft or the runways, and that process was continued, and the stacking done perfectly, it will not deteriorate - much, but such a method is impracticable in the operation of a sawmill.”
Ramsay in answer to the request:
“State any further facts within your knowledge showing the deterioration in the value of lumber that is properly kiln dried, and that which is stacked, without such kiln drying, in the open air,”
—replies:
“From some 20 years of experience, in the service of the Pullman Company, * * * during 10 years of which I was lumber agent and bought all the yellow pine used in their shops, amounting to 25,000,000 or 30,000,000 feet per annum, I can state, from my personal knowledge, that the Pullman Company and most of the railroads throughout the country for whom they build cars were very much averse to using, for various purposes, yellow pine which had been dried by stacking in the open air, instead of being kiln dried, for the reason that yellow pine that is dried by stacking in yard becomes discolored, or, as it is technically called, ‘blued,’ which is considered an indication that the first stage of decay has set in. Their objection to lumber dried in the open air and affected as described above was so great that, in many instances, they would not use such lumber at any price, and if, in some cases, they agreed to use it for common purposes, it was only because it was obtainable at a very much lower price than kiln-dried lumber.”
The witnesses examined on behalf of defendants were: Frank Parsons, a mechanic - in their employ, who has been working im their shops in New Orleans for about four-years, but who has had previous experience-as superintendent in charge of the machinery in sawmills, and of the quality of the output,, including the stacking of the lumber, though never so far south as Kentwood, where-plaintiff’s mill is established. Rudolph Geifers, foreman of yard and planing mill of Union Lumber Company, in New Orleans,, where he has had experience in stacking-lumber brought from sawmills situated elsewhere and intended, mainly, for local trade, has worked around a sawmill, but “didn’t have charge of it.” Hans Nisson, foreman.of yard, in New Orleans, which receives lumber from mills, has stacked the lumber received, but has never been around a sawmill. Dudley Slay has had experience as;manager of sawmill (with interest in mill) for about two years, and previous experience, working for wages, for about seven, years. W. G. Denton, an employe of defendants, whose experience of sawmills has-been confined to putting up dry kilns. W. Graham, who, by subcontract or as employs-of defendants, undertook to put up the kiln, in question, has had considerable experience-in the machinery and timber business, but little, or none, as a sawmill man. J. P. Hinton is the manufacturer of long leaf yellow pine lumber in Mississippi, and has-had 20 years’ experience, with apparently satisfactory results. These witnesses, in general, testify that long leaf yellow pine-lumber may be air dried without “bluing,” but, save the two who are employed in lumber yards in New Orleans, none of them have-ever known it to be done in Louisiana, and neither of the two mentioned profess to have-had any experience in so dealing with the output of a large mill, whether in Louisiana or elsewhere.
*925 Parsons gives it as his opinion (predicated, in part, at least, upon a misunderstanding of the requirements of Star lumber) that “Clear,” air-dried, lumber cannot be reduced by “bluing” to the grade of No. 1 Common, and Hinton testifies to the same effect, which is entirely consistent with his view that such lumber can, and should, be air dried, without bluing at all. As the experience of these two witnesses has, however, been confined to a possibly drier atmosphere that-that which is to be found at Kentwood, and, as plaintiff has produced some 12 or 14 witnesses, a number of whom speak from experience at the locus in quo, and all of whom testifying from experience there or elsewhere, say, in effect, that it is impracticable .to air dry the output of a large mill, without loss by bluing, the only question concerning which there seemso room for doubt is as to the extent of the loss in this case. Most of plaintiff’s witnesses estimate the loss apparently upon the assumption that all of the Clear and Star lumber was reduced to the grade of No. 1 Common. It seems to us unlikely, however, that this should have been the case, as, in the nature of things, a certain proportion of the lumber, as stacked, must have been more, and a certain other proportion,' less affected by the damaging influences than the rest of it, as it must have received more or less air, and absorbed more or less moisture. Our learned Brother of the district court frankly states that, but for the decision heretofore rendered by this court, he would have rejected plaintiff’s present demand in toto. It is- possible that, if he had been in a position to consider the evidence upon which that decision was based, he would have entertained a different view of the matter. Be that as it may, his conclusions upon the question before him, reached after the conscientious and intelligent investigation which is habitual with him, are stated, in part, as follows, to wit:
“Plaintiffs’ witnesses, on the one hand, swear-that the Clear and Star grades were reduced' to No. 1 Common, and that No. 1 Common-was reduced to No. 2 Common, thereby entailing a loss of $8 to $10 per 1,000 feet on finishing boards, of $4 to $6 per 1,000 feet, om finishing strips, and of $1 per 1,000 feet on No. 1 Common; whereas, defendant’s witnesses testify that, if properly stacked, plaintiff’s lumber could not have deteriorated to an appreciable extent, and, that, in any event, it could' not have lost more than one grade, so tha.t the Clear could not have been reduced below Star,, nor Star below No. 1 Common. Figuring upon the latter basis, and accepting as correct plaintiff’s percentage of Clear and Star lumber, Parsons, defendants’ main witness, finds that plaintiff’s loss on the Clear lumber could not have-exceeded $737.10 ($736.90 is a clerical error). The amount of Clear A and B lumber is claimed by plaintiff to have been 409,500 feet. Assuming that 40 per cent, thereof, or 163,800, was = 8 inches or more in width, and that 60 percent. thereof, or 245,700 feet, was less than 8 inches in width, he allows a loss of $3 per 1,000-feet on the former, or $491.40, and $1 per 1,000 feet on the latter, or $245.70, equal together to $737.10. Applying the same rate of loss to the Star (Third Clear), there are 511,875 feet, of which 40 per cent., or 204,750 feet, at $3 per 1,000, would he $307.12, equal togetlierto $921.37. Add to this the loss of $1 per 1,000 on 921,370 feet of No. 1 Common, $921.37, and there is a grand total of $2,579.”
It will be seen from the foregoing that defendant’s main witness, in estimating plaintiff’s loss, bases his calculations upon figures-somewhat greater than those stated in the-petition, and, upon the other hand, that he-entirely ignores the Star and No. 1 Common stock, an error which the judge a quo at. once recognized and corrected. The witness,, however, fell into another error, quite as serious, which escaped the attention of our-learned Brother. Rule 40 of the Southern Lumber Manufacturers’ Association reads:
“40. Third Clear: Inch, Ity, 1%, and 2 inch, dressed two sides, up to, and including, JO' inches in width, in addition to one straight split, not to exceed in length the width of the piece, may have any two of the following defects or-their equivalents: Slight loose grain; three pin knots; one standard knot; three small pitch pockets; one standard pitch streak; three blue sap stains, 2 inches wide, across the face, or-blue sap, not over 8 inches deep, on one end; vane, not to exceed 1 inch in width and one-sixth the length of the piece; or small kiln,, or seasoning, checks. Twelve or 14 inches wilt1 admit three of the above defects or their equivalent.”
*927 In arriving at the conclusion that Olear lumber would not be reduced by bluing (or blue sap stains) below the grade of Star, the witness Parsons interprets the language of the above-quoted rule to mean that Star lumber may have a blue stain 8 inches wide running the entire length of the piece, whereas, the meaning (too plain to admit of any other interpretation) is that a piece of lumber may hold its grade as Star with “three blue sap stains, 2 inches wide, across the face (being the stains left by the pieces, or blocks, which separate it from the pieces above and below it, in order to provide free circulation of air] or blue sap, not over 8 inches deep, on one end [being a provision with reference to the fact that the ends are necessarily more exposed in the stack than the rest of the piece].” And there are several witnesses who testify to that effect. Again, the judge a quo appears to have overlooked the fact that whilst $3 per 1,000 represents the difference in value between Olear and Star lumber, there is a greater difference between Star and No. 1 Common. Thus, according to the price list of the association, “effective January 16, 1901,” “1st and 2nd clear,” 1x12, is quoted at $28.75, and third clear at $25.75, while No. 1 Common is quoted at $20.25— a difference, in the one case, of $3 and in the other of $5.50. It was suggested, in argument, that the bluing of plaintiffs’ lumber might have resulted from attacks on the trees by the Dendoctronus ponderosas, but the witnesses who were interrogated on that subject did not seem to be so well posted as, perhaps, they might have been, and the affirmative testimony, of which there is a good deal, indicates that the bluing was altogether attributable to the air drying — in fact, there was no testimony to the contrary. Our conclusion is that plaintiffs may safely be allowed to recover for a depreciation to the grade of No. 1 Common of 75 per cent, of its Clear stock (including the Star), and for a loss of $1 per 1,000 on the No. 1 Common, upon the basis of the total quantity (2,041,-156 feet), the proportions of the different grades (20 per cent, first and second Clear; 25 per cent, third Clear, or Star; 45 per cent. No. 1 Common) and the ratio of loss ($8 per 1.000 on first and second Clear, and $5 per 1.000 on third Clear, finishing boards) as alleged in the petition; and, upon a basis of a loss, upon the Clear and Star finishing strips, 6 inches wide and under, of $4 per 1,000; our computation being as follows:
122,469 First and Second Clear, finishing boards, at $8 per 1,000...... $979 88
183,704 First and Second Clear, strips at $4 per 1,000................... 734 80
153,138 Third Clear (Star) boards at $5 per 1,000..................... 842 25
229,578 Third Clear (Star) Strips at $4 per 1,000..................... 765 69
918,521 No. 1 Common lumber at $1 per 1,000 ....................... 918 52
$4,241 14
Less amount recovered in previous suit ............................ 1,000 00
Balance due....................$3,241 14
It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by increasing the amount of the same to $3,241.14, and, as amended, affirmed; defendants to pay all costs.